THOMAS WILLIAMS, APPELLANT, VS. MARTHA J. WILLIAMS, APPELLEE.

1. The usual definition of extreme cruelty as a cause for divorce, is that it consists of such conduct of husband or wife as will endanger the life, limb or health of the other, or create a reasonable apprehension of bodily hurt. But what conduct will reach the requirements of this rule will depend upon the circumstances of each case.

2. In this State and in others the rule is extended to mental as well as bodily injuries. If the mental injury is not of itself sufficient to constitute cause of divorce it may serve to aid bodily injury to constitute such cause.

3. Conjugal unkindness, amounting to cruelty, will revive former acts of cruelty, after condonation.

4. Where the wife has no means but alimony for her own support, and the children prefer to remain with the father, who is in a condition to give them a comfortable home and support, and it appears to be to their interests, the better course is to leave them with him.

Appeal from the Circuit Court for Duval county.

The facts of the case are stated in the opinion.

*J. R. Challen* for Appellant.

*A. W. Cockrell & Son* for Appellee.

THE CHIEF-JUSTICE delivered the opinion of the court:

The appellee sued appellant for a divorce on the grounds of extreme cruelty and the habitual indulgence of violent and ungovernable temper. Appellant in his answer denied all the material allegations of the bill, and subsequently filed his cross bill praying for a divorce from appellee on just the same grounds, and also on the ground of desertion. The answer of appellee to this cross-bill denied its material allegations. The trial on the evidence taken resulted in a decree of divorce for appellee and in the dismissal of the cross-bill of appellant. This appeal is from that decree, and the only error assigned is that " there is manifest error in the decree and proceedings of the court below, and that the decree of the court below should have been for the defendant below."

We will confine our discussion of the case to the first ground in both the bills—extreme cruelty.

The definition of extreme cruelty has puzzled the most eminent judges and writers, and while any number of definitions may be found in the books, concurring for the most part in the essential requisites, it is apparent from numerous cases on the subject that where the cruelty is not flagrant violence and injury to the body, clearly endangering life or limb or health, or creating reasonable apprehension of such violence and injury, each case must furnish its own definition through the circumstances attending it, including

not merely the acts complained of, but also the manner of life, physical condition, temperament, personal habits, and such like criteria, that may serve to give the acts their true significance. One general definition is this, "cruelty is such conduct in one of the married parties as, to the reasonable apprehension of the other, or in fact, renders cohabitation physically unsafe to a degree justifying a withdrawal therefrom." 1 Bishp. on Marriage and Divorce, §717. Another, "cruelty is either actual violence, endangering life or limb or health, or conduct creating a reasonable apprehension of such violence." Another, "legal cruelty may be defined to be such conduct on the part of the husband as will endanger the life, limb or health of the wife, or create reasonable apprehension of bodily hurt. What must be the extent of the injury, or what particular act will create a reasonable apprehension of personal injury, will depend upon the circumstances of each case." Odom vs. Odom, 36 Geo., 286, 317.

It may, however, be remarked that the law in regard to cruelty as a ground of divorce has been considerably modified in late years, both in Eugland and in the United States, insomuch that while formerly it required actual violence to the body of the person to constitute such cruelty it is now being held in many, if not most of the courts, that there may be cruelty short of blows or other violence to the body which will authorize a divorce; such as the torture inflicted upon the mental and emotional nature by constant insinuations of evil doing, unfounded and repeated charges of unfaithfulness, studied and gross discourtesies and long neglect, habitually harsh and irritating demeanor, and the like, which go to the extent of affecting bodily health. This doctrine has found favor in this State. In the case of Donald vs. Donald, 21 Fla., 571, this court said, as applicable to the case of a wife, "the better opinion, and one more

consonant with humanity and justice, is that the cruelty to the wife need not necessarily be a bodily infliction." But we have no occasion to invoke such doctrine in this case, except so far as it may serve to emphasize the force of mental injury in aid of physical violence.

As illustrative of the rule generally we cite a few of the many cases on the subject, from which it will appear that whatever the character of the violence to the body, if it be calculated to injure life, limb or health, even if inflicted but once, and there is reasonable ground to apprehend further acts of the same or similar kind, relief will be granted— the reason being that it is impracticable to discharge the duties of the marriage state when such apprehension exists. See Lockwood vs. Lockwood, 7 Eng. Ecc. R., 114 ; French vs. French, 4 Mass., 586 ; Cook vs. Cook, 3 Stock., 195; Hughs vs. Hughs, 19 Fla., 307 ; Pillar vs. Pillar, 22 Wis., 658 ; see also 1 Bishop Marriage and Divorce, §744–5–7.

Guided by the law as we find it from the teaching of the preceding paragraphs, we now proceed to consider the facts of the case. In his answer to the bill appellant gives general and specific denial of the material facts alleged, and appellee does the same in her answer to the cross-bill, with the addition, in regard to desertion, of an exculpatory statement of her reasons for absenting herself from the home of appellant.

In appellee's testimony she states that in 1876 appellant struck her with his open hand a hard blow that made her nose bleed ; that in the fall of that year he struck her with paddles he made for the purpose; that afterwards (date not given) he beat her in the kitchen with a board ; that in 1882 he kicked her twice and jerked her into the bed-room by her arms and got a stick. Once, she says, when she was sick, he slapped her with his open hand and she fell to the

floor, and he struck her once or twice in 1881 with paddles; also struck her with the paddles one morning in 1884 before she left to go to Mr. Richards. (That was when she quit her home the first time.) She further states that in 1884 he said he would cowhide ·her till he cut her back. Also that he cut some hickory limbs, and said he was going to cut her in pieces, and said her back ought to be salted and peppered. Mary Richards, daughter of the parties and witness for *appellant*, confirms ̇ the statement that *appellee* was slapped to the floor. She says that in the spring of 1878 she saw him (appellant) slap and knock her to the floor. We cannot hesitate to say that if these statements are true, appellee is fully entitled to a divorce, if there has not been condonation.

But on the other hand appellant in his testimony denies all the allegations of the bill and these statements as to blows and kicks, and two of the daughters deny ever having seen anything of the kind. Other witnesses who were about the premises from time to time testify that they never saw any violence on the part of appellant toward appellee.

This is substantially the state of the oral testimony in the case on the subject of cruelty; and if this were all we could not but say that appellee has failed to sustain her charge. Perhaps if we had heard the testimony of the witnesses, as given in the .presence of the Chancellor, where there was opportunity to judge of their credibility, our impressions might have been different. But besides this, fortunately for appellee, there is other evidence, which we think not only gives her the preference for credibility, but also seems to strengthen her appeal for relief. The appellant positively denies that he ever struck her, except once ·with a shingle, before they came to Florida. He is emphatic in denying the paddle s!riking. Yet when his wife

was away from him the first time in 1884, he wrote her a letter in which is found this language : " I spatted you once or twice with a paddle, but for what ?"  In another letter to her, artfully seeking to avert her divorce proceedings, he says : " I have erred, but through provocation, and *done* and said things to you in passion that I would not otherwise have done."  Again, in a letter January 19th, 1884, to appellee's brother, after detailing her shortcomings and misdeeds, he says : " in consequence I did things that I by no means would have done had she been a wife to me."  What are these things? Not words, surely, but deeds, and, taken in their connection with the purport of the letters, deeds of such grave character as to require attempts at justification.  These admissions in his letters, so at variance with his testimony, and in effect confirming the testimony of appellee, compel the conclusion that as between the two the award of credibility must go to her.

Still there are the other witnesses in his behalf.  It is enough to say that as to all of these their testimony is of a negative character, to the effect that they never saw any of the blows or kicks she complained of; and it is to be remarked further in regard to the principal of these, that their relations to him were such that the bias of their testimony evidently resulted from his influence over them. Then, as to the two daughters, they testify mainly in the same negative way, but in one or two instances deny that violent acts, which appellee stated to have occurred in their presence, did so occur.  The record discloses their residence with the father, and that they were respectively nineteen and fifteen years old.  It also discloses that a year before they had so completely surrendered themselves to his influence, that their letters to their mother traduced her in the most shameful manner, evidently echoing his own criminations.  This is the more noticeable from the strik-

ing contrast between these letters and those of appellee to her daughters, the latter being what might be expected from an affectionate and ladylike mother.

One of the daughters writes thus: " We have got hold of your rotten meanness and lies that you have been writing back to Richards." " You are the meanest person I ever heard of in my life." " I never heard of such a low, mean, lying creature." " Before I would ever live with you I would rather kill myself;" and more of the same tenor, and this in a letter of some length written by a girl thirteen years old. Another of her letters, spreading over ten pages of the record, written near the same time, February, 1885, contains such language as this: " Trickery, treachery, traitoring and your other dishonesty won't count you anything." " Do you think us children ought to have the least respect or love for you, 'cause we know that you have told the biggest kind of a falsehood, besides traitored papa again." Soon afterwards the sister eighteen years old, and the one from whom we have been quoting, joined in a letter to their mother eleven pages long, written in the same spirit and containing similar morsels of filial regard. A third daughter, eleven years old, writes in the same strain, though in short and juvenile terms. And these three join in a letter to the aunt of their father, which is entirely of a piece with those to their mother. Studying these letters closely and comparing them with letters written by the appellant to his wife and aunt, we think we make no mistake in concluding that all of them emanated from the same source, and that the former were taken from the lips or the pen of the father, or were in their essential parts inspired by him. The style (except the juvenile one), the epithets, the general similarity of reproaches and warning, and other indicia, point to him as really responsible for them. Taking this to be so, and considering their age

and susceptibility to their father's influence in the absence of the mother, we can infer how little reliance is to be placed on their testimony, except as the utterance of his direct or indirect prompting. Under this impression we conclude that in the conflict of testimony that of appellee is the more credible.

In this conclusion we do not forget her card for the public, or her confession to her husband, or her letter to her daughter Mary, in which she is made to withdraw all her charges against appellant. We believe her statement that these were written at the request and instigation of appellant, in fact by appellant himself, and copied by her for the sake of peace ; and while we cannot but blame this weak compliance, we do not think it should operate as evidence of the untruth of such of the charges as she now reiterates.

There is a firebrand in the case which it is a pity should not have been extinguished before it left the hands of appellant. He wrote a letter to the brother of appellee, January, 1884, detailing a long catalogue of offences committed by her against their marital relation, one of which is so horrible we will not soil these pages by naming it, as in the view we take of the case that is not necessary. " Hundreds upon hundreds of times," he says he went into her room at night, quietly as a mouse, and caught her in bed engaged in her here unnamed guilty practice. " Hundreds upon hundreds of times," he repeats, he crept into her room, lamp in hand, and watched her as in her sleep she was going through the same practice. He told the brother that in consequence of her bad conduct, culminating in this degrading offence, " I must either quit her or her own people must take her and do something with her." This, he says in the same letter, " is a thing of long standing, and I

respect myself enough to inform her people that I am determined to get rid of her and let her root for herself, therefore if they want anything with her or desire her, they had better send for her, I have had enough."

This letter came to the knowledge of appellee. Can one imagine the terrible mental anguish it must have given her? If it was true, why has it not appeared as a part of appellant's case in this controversy? He could have produced nothing stronger, if alleged and proved, to ensure the success of his case. That he has not so used it leaves presumption that his hundred-fold upon hundred-fold watchfulness was the result of a morbid condition of mind which gave imagination wing to find things that had no existence, and that he has since realized this. Be that as it may, the charge does not come before the court with that support which entitles it to any weight against appellee; but it does come in the shape of a thrust at her more deadly than any physical thrust.

Again we deduce from the evidence that in order to drive appellee from him, appellant played upon her fears by telling her that certain parties were greatly outraged by what she had said and put in a bill she had filed for divorce (afterwards dismissed), and that they were threatening to prosecute her for slander, libel and perjury, which was a penitentiary offence. The bill which is in evidence contained nothing that any one but himself could complain of, but his story had its effect to drive her to her friends in Missouri. Consider the effect of the apprehension produced on her mind by this; an effect that he was determined should be lasting, for in the letters of their daughters to her, before referred to, one of the things they were particular to warn her of was that the incensed parties were still raging and threatening to have her brought back for trial; of course a suggestion of the father intended to

keep her absent for the year necessary to enable him to become complainant in a suit for divorce.

The letter to appellee's brother, and this device to drive her off, as cruelty affecting the mind, render applicable the rule laid down by an eminent English Judge, who observed of foul and disgusting language, that it " may not alone be cruelty in its legal sense; but the use of it would induce the court more readily to believe evidence as to personal violence; for it would manifest * * the absence of all controlling principle." 1 Bish. Marriage and Divorce, §726. The author instances accusations against chastity. We think the rule would apply to any language calculated to do mental injury, as well as to foul language, though perhaps with diminished force.

The device employed by appellant to keep his wife away long enough to entitle him to sue for a divorce has much weight against him. There can be no doubt that it was a mere device. See the language we have quoted from his letter to the brother of appellee, as to his getting rid of her. In a letter to his aunt, January 19th, 1885, shortly after she left for the West, he wound up a tirade against her thus : " Now I am going to have a divorce. She can never live here any more. Those injured parties say they will prosecute her to the full extent of the law if she returns here." Then in his testimony he says (speaking of her absenting herself out of the way of prosecution): "I said if you want a divorce, you could go and stay a year, and you could get free from me." " After she had come back (this refers to the first time she had left him) and was afraid she would get into trouble (referring to the prosecution threatened, as he had led her to believe,) and said how long would she have to stay before the time would be over, and I said I do not know—perhaps a year, and I will go and see the parties

about peace, so that she could come home." It is to be observed that in less than a month after this, when she had gone, he wrote his aunt the words before quoted: "I am going to have a divorce." So, we repeat, there can be no doubt that he scared her off to further his purpose of getting a divorce, and that this should weigh heavily against him.

Reviewing the whole case on the law and the evidence we cannot resist the conclusion that appellee has made a good case for divorce. As to the evidence, we have omitted so far to speak of the objections of appellant to the letters of the daughters to their mother, and to the former bill of appellee which was dismissed as being legally inadmissible. Deeming the letters as virtually the father's work, as we have before explained, we do not think the objection to them a valid one ; and as to the bill our conclusion is the same, on the ground that it was competent as evidence to contradict statements of appellant in regard to charges contained in the bill, which were not there, but which he insiduously used to drive appellee from home.

But appellant claims the benefit of condonation. Applying the rule on that subject, which holds that acts of cruelty committed after a reconciliation revive the former cruelty, condonation being always conditional on good treatment in the future, we think the claim unfounded. "The condition is that the party condoning shall be thereafter treated by the other with conjugal kindness. The meaning is, both that the like offence shall not be repeated, and that otherwise there be no conjugal unkindness. On a breach of the condition, the condoned offence is revived." 2 Bish. Mar. & Div., §53. We need only recall appellant's conduct in connection with appellee's departure from home the last time, exciting fears that set her fleeing, as she

thought from the penitentiary, and instigating his daughters to keep these fears alive to the end of a divorce to be procured by her, to satisfy us that the conjugal unkindness was grossly repeated after the condonation. The cruelty may not have been of precisely the like kind, but it was sufficiently so to work a revival of the former cruelty.

We do not think the amount of alimony given by the court was excessive, and we will not disturb the decree as to that.

While we affirm the decree in granting a divorce, we think in consideration of the testimony and the preference of the children, and of the wife's want of means to support them, that it would be better to leave all of them in the custody of appellant, and we make a decree accordingly, also modifying the Chancellor's decree in regard to the lien given on lands, which we take to be the homestead.

Our conclusion in favor of a decree of divorce for appellee necessarily involves a decision against appellant on his cross-bill.

Our decree will be entered and a certified copy sent for record in the Circuit Court from which the case comes.