FRANK H. PALMER, APPELLANT, VS. ELECTA E. PALMER, APPELLEE.

1. Divorce on the ground of extreme cruelty will be denied, where there is no actual bodily violence, unless the treatment, or abuse, or neglect, or bad conduct complained of be such as damages health, or renders cohabitation intolerable and unsafe or unless there are threats of mistreatment of such flagrant kind as to cause reasonable and abiding apprehension of bodily violence, so as to render it impracticable to discharge marital duties.

2. Nor will divorce on the ground of habitual indulgence of a violent and ungovernable temper be granted, unless that temper has been displayed towards complainant, and habitually, and with the effect of rendering life an oppressive and intolerable burden, and making it impracticable to discharge marital duties under such burden. Occasional outbursts of passion, petulence, readiness to anger, frequent and unreasonable complaints, though made in a loud voiced, boisterous manner, if these are only calculated to render the relations between the parties unpleasant and disagreeable or simply unhappy, do not furnish sufficient cause for divorce.

Appeal from the Circuit Court for Hillsborough County.

The facts of the case are stated in the opinion.

*H. C. McFarlane, D. F. Hammond,* for Appellant

*Barron Phillips, Sparkman & Sparkman,* for Appellee.

Appellee, to sustain her charges, produced evidence principally of herself, Miss Fanny Robles, F. M. Robles, Mrs. Ella C. Chamberlain, Mrs. Rebecca Jaggar, her mother, Eugene White, I. W. Warner and others.

Appellee, on her own behalf, testifying in substance that she and defendant had been married about six years ; that beginning almost immediately after the marriage and down to the time she left her home, Palmer continued the abuse and ill treatment of her, scarcely ever during the time speaking kindly to her, and often without any just cause going days without speaking to her at all; that he compelled her at times when she was in very delicate health to perform labor beyond her strength even when in health. That he did not give her sufficient food and clothing, making it necessary for her at times to go either to her father's house or to some neighbor's for food for herself and children. That he treated her immediate friends badly in her presence and was also in her presence abusive to her father,

mother `and brothers. Accused them to her 'at times of stealing from him and her of stealing from him for them. That he at one time in making a distinction between their two children, the eldest and the next, said, the eldest would be a smart man like himself, but the other one would be no account just like her old daddy. That at one time on her return from a musical entertainment in which she had been engaged at a neighbor's house he locked her out of the house at 9 or 10 o'clock at night, and when she finally effected an entrance through one of the back doors he lay awake abusing her until a late hour, calling her hard names and using obsene language to her, took her watch and chain from her and never returned it for months and did not speak to her for a week or more thereafter. That he also about this time told her that his sister, a Mrs. Gay, would be down in a few days and that he was going to send his eldest child back North with her as he wanted him to be with somebody half decent. That again one day when he had been abusing her, she burst out crying, and asked him if he intended to kill her with his unkindness? he replied he didn't care; that he and the children would be better off without her. And again that if it wasn't for the fact that the title to the place on which they lived was in her name he would kick her off the place. Accused her frequently of being untruthful, often telling her she lied. Once late in the night threw a heavy mattress upon her and the children, at the same time using his accustomed abusive language to her. That about the time of her marriage or just after, he had caused a piece of land, upon which they subsequently lived, to be deeded to her as her separate statutory property, and just before she left him he had defrauded her out of it.

Appellee also introduced in evidence a bill filed by her

after her separation from him against appellant. *et al* to set aside said fraudulent transfer and to reinvest her title, in which bill the above facts were fully set up, viz.: that the title had been in her from the time that Palmer caused the land to be deeded to her. That it was their home place. That some little time before their separation Palmer had begun to talk to her about the land; had told her that he desired to build a nice house on the place, and further stated that in order to do so it would be necessary to sell other lands that he possessed; that she agreed to this, but Palmer having conspired with other parties, viz.: one Gay, his brother-in-law, and one Randall, to defraud her out of the home place, had it also deeded to the said Randall, who was the purchaser of the other land, and had it all deeded without her knowledge to the said Randall, who afterwards conveyed to Gay without any consideration whatever and without the said Randall having paid any consideration therefor.

The answer of appellant which was also introduced by complainant admitted all of the above facts except an intent to defraud her and claimed that she knew what she was doing when she signed the deed, or if she did not it was her own fault, or words to that effect; but went on to allege such a state of facts as to show that Mrs. Palmer did not know what she was doing when she signed the deed.

It also appeared in evidence that just after learning of this condition of things Mrs. Palmer left her husband's home and went back to her father's house where she has remained ever since, although Palmer had frequently requested her to come back and live with him, she as constantly refusing so to do.

It further appears from the evidence of complainant that the annual income of Palmer was about fourteen hundred

dollars made principally by him in attending to and working upon orange groves under contract and that Mrs. Palmer had nothing of her own except the place out of which he defrauded her, and no means of making a living except by her own exertions.

Miss Fanny Robles corroborated many of the above statements. Said that she had known Palmer to abuse his wife, to use harsh language to her. In fact never knew him to treat her well. That Palmer had locked up the piano so that Mrs. Palmer couldn't play on it. Heard him say in his wife's presence that she was fit for nothing ; that he didn't know what he had married her for. That she was accustomed to visiting the house a great deal and never heard him speak kindly to her. That he took scarcely any notice of his wife in company. That she had heard him call her a liar frequently and often heard him speak in Mrs. Palmer's presence in disrespectful terms of Mrs. Palmer's father, mother and brothers, saying that they were low, etc.

F. M. Robles also testified to Palmer's cruel treatment of his wife, particularly on a trip down the bay to Sarasota.

When one night he took the youngest child away from his wife and was gone several hours, no one knew whither, and that Mrs. Palmer said at the time that it was to aggravate her and when he brought the child back at a late hour in the night he lay awake some time quarreling with and abusing his wife.

Isaac W. Warner also testified to having heard Palmer storming at his team and at his family clear to his house, something like a quarter of a mile away.

A great number of witnesses, among whom were Mrs. Ella C. Chamberlain, F. P. Chamberlain, J. B. K. Drake et al., testified to Palmer's reputation in the community as being a quarrelsome and overbearing man.

Mrs. Rebecca Jagger knew also of the unkind treatment by Palmer of his wife, who was her daughter, and had spoken to him about it. His reply being "My tongue is my own and I can use it."

A. T. Thompson testified that he knew Palmer, had worked with him; that he was a quarrelsome, overbearing, domineering man, cruel to animals; during the two or three years he knew him used up by his abuse and cruelty as many as seven or eight horses or mules. That different good citizens came to him while he was working with Palmer and begged him to talk to Palmer and persuade him to be less abusive.

Eugene White also testified for appellee that he had lived with Palmer and his wife before their separation, viz., in the early part of 1885, and knows that Palmer's treatment of his wife during that time was very unkind. That he frequently appeared to be angry, cursed and abused her, telling her that she had nothing, that he was tired of her eating his meat and bread, and threatened to kick her off the place. And that he often appeared to have no control whatever over his temper. That during all this time Mrs. Palmer conducted herself towards him gently and peaceably, appearing to pay good attention towards household affairs, did the cooking, attended to her children in person, did part of the washing and all the ironing. That Palmer told him the reason he married his wife was that there was no other northern girl in the neighborhood. That he quarreled with her when she visited the neighbors and would also quarrel if the neighbors visited her, saying that he did not want them there eating his meat and bread.

On behalf of appellant a great number of witnesses testified, some to the effect that he was kind to his wife, or rather, was not unkind whilst in their presence; others that

they had sold him a great many goods, or had known of his purchasing them for his family. Whilst others again testified to his character for truth and veracity. This in answer to an attack that some of appellee's witnesses had made upon his reputation in that particular. But none except Palmer and his sister Mrs. Gay, undertook to deny the material part of the testimony of complainant and her witnesses. But Palmer himself in his testimony denied much of what complainant had testified to and undertook to offer explanations of other parts, the principal portion of his testimony being directed to prove that his wife was lazy, spent too much of her time with her neighbors and at music; that he had furnished her with a sufficiency of food and clothing and that he had not treated her cruelly. In his explanations, however, he admitted much that she had testified to be true and showed that many things had transpired between them that were unpleasant and that he was constantly finding fault with her.

The court will remember that the charges in the bill were those of extreme cruelty and indulgence in ungovernable temper by appellant towards appellee, (instances of such cruel treatment and exhibition of ungovernable temper being given in said bill) and also remembers the evidence of appellee in support of those charges. In addition to the great number of instances of outbursts of passion on the part of appellant towards his wife, his constant cursing and abusing her, instances also of "abuse and mistreatment" of her near relatives, whom she reverenced, were given.

And it was further shown that appellant had defrauded her by the aid of other parties out of her separate statutory property. All of which we think was more than sufficient to sustain both of the charges of extreme cruelty and ungovernable temper.

Without stopping to give Mr. Bishop's definition of cruelty we will cite the Court to the case of

Donald vs. Donald reported in 21, Fla. 571.

And also that of

Williams vs. Williams, 23, Fla. 324,

in both of which cases a definition of extreme cruelty, as applicable to this case, was given and in the former of which it is said that

"In arriving at a conclusion as to what cruelty can properly be designated as extreme, the surrounding circumstances of the parties should be carefully considered. The Courts should look to the mental and physical condition of the persons upon whom violence is inflicted. An act which would be lightly regarded by a woman of firm and vigorous mind, and a person whose sensibilities to insult and ill treatment are dull and obtuse, might be an act of extreme cruelty to a woman in poor health and of acute sensibilities        *    *    *    *    *    *    *    *
"They" (the courts) "should consider too whether the act was caused or provoked by the wife, and the degree of provocation, whether little or great, or *whether it was wholly unprovoked.* In the latter case a small amount of violence without cause has been considered to be under peculiar circumstances sufficient to justify the Court in saying the woman was not safe."

Again the Court in the same case says: "The better opinion and one more consonant with humanity and justice is that the cruelty to the wife need not necessarily be a bodily infliction of personal violence. That is not the only method of treating her with extreme cruelty. To an educated, delicately nurtured and fragile woman, the imagination can easily supply kinds of treatment which would equal

if not exceed the cruelty of a blow.     *     *     *     *

"The abuse and mistreatment of her near relatives, whom she reverenced, and denial to her of the means of making a decent appearance in the society to which she was accustomed, continuous coldness of manner toward her.     *     * These and the innumerable annoyances which malicious ingenuity can invent to the kind of woman supposed would, in damaging effect on her health and hapiness, far exceed the effect of a blow."

Now in this case it has been shown that Mrs. Palmer was a highly educated and refined lady, whose parents, it is true, were poor, but who had evidently raised her well. It is to be presumed, and the evidence shows, that she reverenced and held in high esteem those parents, and yet she was accustomed for years to listen to the constant abuse of those parents by her husband, he telling her time and again that they were low, that they were stealing from him, that she was stealing from him for them, etc., all of which certainly brings it within the case just cited.

Then again the conspiracy, or whatever it may be called, which resulted in defrauding appellee out of her statutory property, the place upon which she resided and the house in which she lived, without her knowledge and consent, was justly regarded by the chancellor, who rendered this most equitable decree, a sufficient ground for granting the divorce.

Palmer had himself, according to his testimony, deeded her the property when they were first married for the purpose of securing to her a home for herself and children. Afterwards he concluded, impelled by what motive we need not enquire, that the title to this property should be in him, no matter what means he might adopt to accomplish that end, and leading her to believe not only that he

was not desirous of selling that property, but was really desiring and intending to sell and convey other property for the purpose of building a house on hers, induced her to sign a deed, without her knowledge of its contents, by which she conveyed away the last vestage of her right in the place on which she lived.

2, N. J. Equity 459.

11, N. J. Equity 195.

25, N. J. Equity 527.

20, N. J. Equity 123.

73, Ill., 497.

103, Ill., 477.

40, Am. Rep., 461 and note.

46, Am. Rep., 108.

50, Am. Rep., 540 and note.

51, Am. Rep., 732.

36, Am. Rep., 848.

23, Fla., 540.

21, Fla., 574.

As to the ground of appeal that the Court erred in receiving evidence of a conspiracy to defraud appellee out of her statutory property and considering evidence of the abuse and mistreatment of the near relatives of appellee by appellant, we consider that sufficiently disposed of in what has already been said by the authorities already cited.

If as a matter of law a divorce may, under the circumstances stated, be granted on account of the mistreatment of the near relatives of appellee and on the ground of the fraud perpetrated on appellee by appellant, then it certainly follows that evidence to sustain those charges was properly admitted.

Judge Walker, of the Second Circuit, sat in the place of Mr. Justice Mitchell, who was disqualified.

MAXWELL, J: This is a suit for divorce, the wife being the complainant. Her grounds of complaint are, extreme cruelty and habitual indulgence of violent and ungovernable temper towards her on the part of the husband. The original bill having been deficient in specifying the acts on which these charges were predicated, an amended bill was filed, to which there was a demurrer, afterwards waived, as it was succeeded by an answer without any disposal of the demurrer, so far as shown by the record. Issue was made, proofs taken, and on the final hearing a decree was rendered for the complainant, and from that the husband brings this appeal.

In support of its general charges, the amended bill alleges that the defendant failed to provide complainant sufficient food and clothing, so that she and her children frequently suffered for the common necessaries of life; that during her first and second pregnancy, he would force her to perform manual labor far beyond the strength of even a woman in good health, and when she would fail to perform the labor demanded he would fly into violent passion and abuse her, using the most indecent, harsh and profane language; that at one time not more than fifteen minutes before her confinement he compelled her to run after his mule, which he had negligently allowed to escape, and becoming very angry cursed and abused her because she could not catch or round up the mule, although she did all she could, and from her exertions and the abuse she was seized with labor pains, and soon after was delivered of a child, suffering intensely at the time and for several days thereafter, and this nearly resulted in the death of both herself and child,

which was caused by this unkindness and cruel treatment
he scarcely ever speaking a kind word to her during the
suffering.  That while they lived together he would often
for nothing or for the most trivial causes fly into paroxysms
of uncontrollable passion towards her, and would curse and
abuse her, telling her he wished she was dead, and that
he and the children would be better off if she were dead.
Sometimes he would become angry with his team when
plowing or driving, and would come home and vent his
anger upon her.  That beginning almost immediately after
their marriage, and down to their separation he was con-
stantly quarreling at her and abusing her.  Once she
returned in the night from a neighbor's house, where she
had been attending a musical entertainment, and found that
he had locked her out, and it was with great difficulty that
she effected an entrance; and he became angry with her
because she had entered, and refused during the succeeding
week to furnish her with food for herself and children, caus-
ing them great suffering.  That about four months ago he
became violently angry with her for allowing her mother
to visit her, and threatened to kick her out of the house if
she did not keep her mother away, and his treatment of her
father's family had been such that she has been entirely
deprived of their pleasant social intercourse.  That she is
both by nature and by sickness and long suffering, brought
on by his unkindness and ill-treatment, of a highly nervous
and excitable temperament, and he, well knowing this, has
often, with intention of worrying, annoying and injuring
her both bodily and mentally, said unkind and cruel things
to her, which had the intended effect.  At one time, because
she would not make a deed to him of the place on which
they lived, the title of which was in her, he became very
angry and told her that but for the fact that the title was in

her name he would kick her from it. She refused to make the deed then, but sometime afterwards discovered that in making a deed to one Randall at defendant's request, he had, without her knowledge, fraudulently inserted therein the numbers of the land of their home place, and that through several conveyances the same had been deeded to him. Whereupon, "unable longer to endure," etc., she separated from him.

There are other charges in the bill with a view to having the custody of the children awarded to complainant, but these need not be set out, as this becomes unnecessary under our view of the merits of the case upon the evidence.

The answer of defendant to the original and amended bills give a categorical denial of every material allegation therein, adding explanation as to some of the charges, and vindication of conduct in some matters not deemed material by us; but it is unnecessary to recite details, since all through the case the complainant and defendant are in direct antagonism in their allegations and testimony, and thus apparently neutralize each other, leaving us to determine between them by rules of evidence, and by other testimony as these may dictate.

In the attempt to sustain by evidence the charges of extreme cruelty, and of the habitual indulgence of violent and ungovernable temper, the facts are so intermingled as to leave it uncertain, for the most part, to which of those grounds of divorce respectively they are intended to be applied; many facts being common to each ground, we will apply them indiscriminately, distinguishing others as occasion may require.

The case is one in which there is no allegation of actual violence to the person of complainant, nor any testimony that in the slightest degree points to violence. It must,

therefore, be governed, in respect to cruelty, by the rules
of law which relate to divorce for injury inflicted through
the mental and emotional nature.   In this State it has been
held that such injury, when in effect on health and happi-
ness it is no less damaging than the effect of blows on the
body, sufficient to amount to legal cruelty, is good cause
for divorce.   Donald vs. Donald, 21 Fla., 571.   But the
treatment, or abuse, or neglect, or conduct, whatever it may
be, short of bodily violence, that will authorize divorce,
must be of a character to damage health, or to render co-
habitation intolerable and unsafe.   The Donald case goes
no further than this; and its doctrine on the subject is ap-
proved in Williams vs. Williams, 23 Fla., 324.   But it may
be said further, that in the absence of bodily violence, if
threatening, or the abuse or mistreatment is of a flagrant
kind to cause reasonable apprehension of such violence, so
as to render it impracticable to discharge marital duties
because of this apprehension, relief should be granted.   Un-
der the authorities cited in the Williams case, this rule is
held to apply in the instance of a single act of violence,
and we think it no less applicable, even if there has been
no act of violence, where the conduct complained of has
given equally strong and reasonable ground for abiding ap-
prehension.

   Giving the wife in the case at bar the benefit of this rule,
and also of the rule which takes into consideration the effect
on her health of the mistreatment charged against her hus-
band, there having been no actual violence, we do not find
in the evidence satisfactory proof to sustain the complaint
for divorce on the ground of extreme cruelty.   Apart from
her own testimony on material points, which is directly
contradicted by the testimony of the husband, there is little
to support the charges of the bill.   There is enough, if gen-

eral assertions by witnesses of extreme cruelty could be of any avail, but when they come to specify the acts which constitute the cruelty, the evidence is altogether insufficient. For instance, as to neglect in supplying food and clothing for the wife and children, which is the most serious ground of complaint, much of the evidence for complainant consists of statements made by her to neighbors. Fanny Robles says "she came to our house once saying she was hungry and wanted some fresh meat, that she had none at home, that she had'nt anything to eat. She only came this once for something to eat." But she says also, "I have been there (house of the parties) when he had plenty, and still I have been there at other times when he had scarcely anything at all in his house to eat. One time he had only a barrel of flour in his house. If he had anything else there it was certainly not in his cupboard, store room or kitchen. * * * I have known this to occur after." Then she tells how the children would run to the cupboard for something to eat when they were brought to her house. As to clothing, this witness says, "I can't tell very well" how Mr. Palmer provided for his family. "On one occasion, I spent the night with Mrs. Palmer, and she had neither nightgown for herself, or to offer her company." But further on she says, Mrs. Palmer always appeared to be comfortably clad, and to have enough, but not as much as the other ladies." All another witness says is, "that according to their circumstances, Mrs. Palmer did not have plenty of clothing, or what they ought to have had." The mother of complainant says, her daughter sometimes came to her house for something to eat, and has told her she did not have enough to eat at home; but says also, "I don't know that I can say that I ever visited her house when she was out of provisions," adding, "I went there very seldom, and my stays were very short; don't know whether there were provisions, or not."

This testimony for complainant on the charge under consideration, which is all the record shows of any consequence, except that of complainant herself, wholly fails to prove that she or her children at any time suffered for the want of food or clothes. Indeed, one of the circumstances stated by one or more of the witnesses and relied on to show that they did—the running of the children to the cupboard of neighbors when their mother took them visiting—produces on the mind of the writer a contrary impression. The little fellows must have learned from their experience at home where to find something to eat, and that experience led them to expect the same elsewhere. The manners of such conduct was more involved than hunger. But the other testimony is scarcely of more force. As a matter to be noted as significant is, that the only witness of complainant who had boarded in the house at different times had nothing to say about deficiency of food or clothing.

On the other hand a number of witnesses for defendant, whose opportunities for observation as near neighbors, visitors, and some of them boarders, were good, testify that the family was well provided with provisions and clothing. Some of this testimony, to the effect that the witnesses, though near neighbors to the parties, and being with them from time to time, never heard or saw anything to justify the complaints of the wife, being of a negative character, is of little weight, but that of those who boarded in the house for months, one of them a boarder for four or five months just preceding the separation, is positive to the effect that there was no deficiency of supplies; and as to clothing of wife and children, a list of what was in the house when complainant left her husband, taken by two neighboring ladies at his request soon after she left, shows ample supply for the family, and they say it was sufficient, and that

there was also sufficient comfortable furniture in the house. We do not give the evidence of the several witnesses in detail, but its substance is as we have stated it, and its preponderence over that in behalf of complainant is very manifest in the record.

There is no evidence but her own as to the husband's forcing complainant to do manual labor far beyond her strength, and his violent passion and abuse when she would fail to perform the labor demanded; or as to compulsion to run after a mule no more than fifteen minutes before her confinement, and his cursing and abuse because she could not catch or round up the mule, and the consequent injurious effects upon her; or as to her being locked out one night when she returned from a musical entertainment, and his anger on the occasion, and his refusal during the succeeding week to furnish food for herself and children; and her evidence on these complaints is denied by defendant.

In regard to the complaint against the husband respecting his conduct towards her father, mother and family of complainant, there is nothing shown that could seriously affect the life of complainant. There was some interruption of intercourse between them, because the father and mother seem to have found it disagreeable to visit the house of complainant often, and there was unpleasantness because defendant objected to what he considered too much sponging of the family upon him. There is really some evidence to show an active and kindly interest of defendant in members of complainant's family, but the complaint to the contrary is so unwarranted, so far as appears from the evidence, that we deem it unnecessary to discuss the matter further. Dislikes that so frequently occur under similar circumstances, if they lead to nothing worse than intemperate language, do not furnish sufficient occasion to break the marriage tie.

Another complaint much relied on is the alleged fraudu-
lent conduct of the husband in procuring the title of the
home lands which he had deeded to the wife to be trans-
ferred back to himself. This transaction could not have
been consummated except by the joining of the wife therein,
but she charges that the numbers of the lands of the home
place were fraudulently inserted by defendant in the deed
she signed, and without her knowledge. The defendant
denies this, asserting that he practiced no deceit and that
she knew she was deeding the whole property. In their
testimony they are in direct conflict as to what occurred be-
tween them then, touching her knowledge of the contents of
the deed, and there is no testimony but hers to support her
charge. So far as she implicates the brother-in-law of her
husband, Charles Gay, in the alleged scheme to deprive her
of her lands, he admits that he had a conversation with the
husband about the effect upon his credit of having the title
to the lands in the name of his wife, but denies that he ever
"advised him to get the title out of his wife's hands, or any-
thing of the kind;" and says that when he received the trust
deed under which he conveyed the lands to the husband, it
was a surprise to him. We do not find the proof in regard
to this land transaction sufficient to make it the basis for a
divorce; and we are not prepared to say that even if the
alleged fraud were satisfactorily proven, it is such cruelty
as under the law would authorize so grave a remedy as di-
vorce.

We come now to the evidence that may be applied alike
to both the grounds on which the divorce is sought—
extreme cruelty, and the habitual indulgence of violent and
ungovernable temper. We have seen that where there has
been no real violence, the acts or conduct which will author-
ize divorce on the first of these grounds, must be such as

affect health, or such as give reasonable apprehension of violence not yet committed. The evidence entirely fails, in our judgment, to show that complainant has suffered in health from any treatment of her husband, or that her health has been at all affected, except in such a way as results from child-bearing, and this is not shown to have extended beyond the ordinary course of nature. She had three children within less than six years, and is not shown to have been in a worse state for bearing the third than for bearing the first, though in the meantime she had the burden of nursing, in addition to the labor and household duties devolving on her as the wife of an ordinary workingman. If she had toothache, backache during pregnancy and at other times, nervous depressions that sometimes send a wife and mother to the lounge, these are not such unusual conditions in early married life as to drive one to the conclusion that there must have been other than natural causes to produce them; and such conclusion will not be adopted in the absence of stronger evidence than appears in this case that the ailments were caused by maltreatment. The evidence also fails to show that there was any reasonable ground on which the wife could entertain apprehension of bodily violence. For a man of such violent temper as she and some of her witnesses impute to the husband, it is remarkable that not a single instance of actual violence on his part against her or any other human being is produced; while on the other hand it is stated, and not denied, that he was never known to strike or engage in bodily conflict with anyone. Nothing in his past conduct, therefore, could justify any fear of violence from him. So, neither as to health, nor as to reasonable apprehension of future violence, do we find proof sufficient to authorize divorce on the ground of cruelty.

As to the "habitual indulgence of violent and ungoverna-

ble temper," it must be temper displayed towards the complainant. (Johnson vs. Johnson, 23 Fla., 413.) Further than this there is no decision in this State, or elsewhere, so far as we can discover, which defines the meaning and scope of this language of the statute; and the difficulty of giving any satisfactory general definition beyond that inherent in the words themselves is apparent. So that the circumstances and facts of each case must be the guide by which to determine whether a party is obnoxious to the charge. And it is not enough that these should merely show the temper as one exhibited in a general way, as one characteristic of the party, nor enough that when exhibited towards a complainant it is only calculated to render the relations betwen the parties unpleasant and disagreeable, or even unhappy. This state of feeling may be produced by but occasional outbursts of the temper described, or by indulgence of a lesser degree of passion, by constant petulence, readiness to anger, a spirit prompting to frequent and unreasonable complaints, and other like causes inimical to domestic happiness. But these do not make a case for divorce under this statute; and to make a case on the temper described, that temper must have been indulged against the complainant habitually, and with the effect of rendering life an oppressive and intolerable burden, and making it impracticable to discharge the duties of the marriage state under such burden.

Looking to the evidence in support of the charge in the present case, we find that of the complainant offset by that of the defendant in all material matters. While she says in general terms that his temper towards her was violent and ungovernable, the instances she gives to show this, either as to language or conduct, are for the most part insufficient to show more than crossness, or sulkiness, or anger. Her

own expressions in regard to those instances are not stronger than "cross," "unkind," "harsh," "angry," "cruel;" and altogether this sort of display of his temper, so far as gathered from her evidence, occurred in domestic disputes, or family complaints, that took the usual course of such disputes and complaints, and in which at times he may have been offensive and too censorious, but not to the extent of displaying a violent and ungovernable temper. But the defendant, admitting that he was sometimes in bad temper with his wife, and spoke to her angrily, says that he was ordinarily kind and indulgent to her ; and his evidence amounts to a denial, or reasonable explanation, of all the specific charges appearing in the testimony of his wife that are of any serious consequence.

Of other witnesses called for complainant, Fanny Robles seems to have been most relied on to support the charge. She seems to have been a specially intimate friend of complainant, and was often at her house. The most she says, instancing different occasions, is that defendant acted "rude and ungentlemanly," "his manner was very insulting," "spoke to his wife as though she was a brute," called her a "liar," and a "good for nothing lazy lout," "noticed his ill-treatment of his wife," etc., there being in her testimony nothing stronger to show violent and ungovernable temper of defendant towards his wife. F. M. Robles, another witness for complainant, being asked if he knew the character of defendant in the community in which he lives "for being a man of ungovernable temper," replied, "I think he has a very high temper, and exhibits it very often, but whether it is governable or ungovernable, I cannot say ;" and he says afterwards, "I have known Mr. Palmer on several occasions to exhibit his temper, acting very badly towards his team, towards his children, and towards his wife, and in speaking

about his neighbors," and then gives instances of "unkind" action that are simply trivial.   The Chamberlains, husband and wife, witnesses for complainant, give little testimony on the subject, except as to the high passion defendant was in the day his wife left him, (which is not at all pertinent,) and a confession of defendant to Mr. Chamberlain at that time, that when he got mad : "I rave and storm around, and then it is all over, but when my wife gets mad she never says any- thing.   If she would say something, would quarrel with me, and be over with it, it would be better."   S. J. Lyon, a witness for complainant, and a near neighbor, who has known the parties for  eight years, says :   "I never heard anything of  Mr. Palmer's being a high-tempered man before this case commenced.  * * * I have  never regarded  him as being a man of ungovernable temper."   A. Thompson says : "the defendant  was  habitually  quarrelsome,  domineering,  and abusive in his language.   He was generally so in his neigh- borhood.   He was cruel to animals," etc., but he says noth- ing of defendant's conduct towards his wife.   Mr. and  Mrs. Jagger, father  and  mother of complainant,  say,  the  first, that he "dosen't know much about what temper Mr. Palmer exhibited at his  house, for I was  not there.   I have seen him exhibit his temper with his team and parties outside." The latter, when asked as to her knowledge of defendant's unkindness to his wife, said :   "when I would be  there he was always finding fault with her, she could  never do any- thing right, and in such a way that he was very unkind and cruel."   White, who lived two months with the  parties, says :   "defendant's treatment towards his wife * * *  was unkind.  * * * He frequently appeared to be mad and cursed and abused his wife and threatened to kick her off the place."

There is nothing in the evidence of  greater force against defendant than what we have quoted.  Considering the case,

then, upon the evidence for complainant alone, it shows the defendant to be a man of irascible disposition, of querulous habit, and prone to use harsh and improper language; but it does not show the higher temper which. the statute contemplates, and so far as it has any tendency in that direction, it fails to show the *habitual* indulgence of it towards his wife, which is a necessary ingredient of the complaint.

But on the part of defendant there are several witnesses, some of them near neighbors, and others inmates of the household for weeks and months, who testify to the kindly conduct of defendant towards his wife, so far as their observations extended, and to the absence of any such exhibitions of temper as are charged against him, while in their presence. This is somewhat negative evidence, but it is hardly conceivable that if the defendant had the outrageous temper ascribed to him, he would not sometimes have displayed it before some one or more of the eleven witnesses who testify in his favor on this subject, and who had such opportunities to observe his conduct. The immense volume of testimony has forbidden any attempt to give much of it in even the briefest condensation, and hence we limit ourselves mainly to the conclusions we have drawn from it, after the most careful study of the whole of it. Of the evidence for defendant as to temper, we copy only that of one witness who worked and boarded with him five or six months immediately preceding the separation, He says; "All I saw of Mr. Palmer's conduct towards his wife while I was there was nice and kind. Never knew there was any difficulty between them. Mr. Palmer acted towards his children just as a nice father could, and they did so towards him. When Mr. Palmer would come in with his wagon at any time of day both of the children would run out with

their hands up to meet their father, and he would take them up into the wagon very kindly and set one of them on his knee and the other beside him, and drive to the barn, where he would take them down very kindly and gently. When Mr. Palmer was at home he would bring in wood and water, make fires, and start to cooking the breakfast. I have seen him wash and dress his children, and sometimes put them to bed. When I was boarding there I had always plenty to eat, and everybody else had. Of different things too. During the whole time I was there I never heard Mr. Palmer use an unkind word towards his wife and children."

We omit comment on a great deal of evidence in regard to quarrels of defendant with his neighbors, as it has no pertinency, but even if it had there is nothing in it that shows more than occurs in ordinary disputes between neighbors. We think much of what is said against defendant arises from his habit of loud and vehement talking—several witnesses testifying that this is his habit in ordinary conversation.

Reviewing the whole case upon the law and evidence, as we understand both, it appears to us that neither the charge of extreme cruelty nor that of the habitual indulgence of violent and ungovernable temper is sustained by the proofs. As to the former, we think there can be no doubt of the failure of proof, and as to the latter, if complainant's evidence does not fail, as we think it does, to sustain her case, certainly the record shows a preponderence of evidence largely in favor of the defendant. And when it is seen that these charges are made against a man, who, notwithstanding all his loud and boisterous talking, and his petulent and angry complainings, never committed an act of violence upon any one, who is a sober, industrious, hard working

laborer, who strove to place his wife on a plane with culti-vated society, expending his hard earned means in providing a home in which comfortable furniture and a piano for her were evidences of his family pride and devotion, whose children showed their eagerness to run to him when he returned home from his work, thus evincing that they found in him a kindness of nature inconsistent with the character this suit seeks to stamp upon him, who, when his character for veracity is attacked, produced abundant evidence to put the attack to shame, and who has shown a conciliatory spirit in this controversy in marked contrast to that of complainant—when all this is seen, we cannot but think that such a man should not be condemned except upon better and stronger evidence than has been produced against him in this cace.

The decree is reversed and the bill will be dismissed.

On motion for a rehearing.

MAXWELL, J. We have considered the four grounds on which a rehearing is asked, and find nothing in them to justify the petition. So far as the decision of the case involved a question of fact, a cursory reading of the opinion will show full consideration of the question, and will show too that questions of law were necessarily involved in any proper decision of the case. As to the relative weight of the testimony of appellant and appellee, we did not fail to consider that the reputation of appellant for truth and veracity was attacked, but in our judgment the attack was not sustained; and it is also a mistake to suppose that we did not consider the character of the witnesses, as much so as could be done from the record, or that the Court did not give proper weight to the findings of fact by the Chan-

cellor who tried the cause below. Every phase of the case suggested by the petition for rehearing was most carefully and laboriously considered.

A rehearing is denied.